No. 13476

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

THE STATE OF MONTANA,

                    Plaintiff and Appellant,

    -vs-

JACK M. SCANLON,

                    Defendant and Respondent.

---

Appeal from:  District Court of the First Judicial District,
              Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

    For Appellant:

        Hon. Robert L. Woodahl, Attorney General, Helena,
        Montana
        Thomas Budewitz argued, Assistant Attorney General,
        Helena, Montana
        Albert Melloling argued, Special Assistant Attorney
        General, Helena, Montana

    For Respondent:

        Donald Garrity argued, Helena, Montana

---

                            Submitted:  October 21, 1976

                            Decided: DEC 30 1976

Filed: DEC 30 1976

_Thomas J. Kearney_
                              Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The state appeals from dismissal of eighteen counts of perjury returned by the grand jury against Jack M. Scanlon, defendant. The grand jury in Lewis and Clark County initiated an investigation into defendant's Workers' Compensation related activities. The foreman of the grand jury stated:

> "* * * Pursuant to this inquiry, the Grand Jury will examine the activities of Jack Scanlon in his representation of claimants before the Industrial Accident Board and the Workmen's Compensation Division during the period between mid-1969 and mid-1973 and thereafter.

> "This inquiry will include a review of each step of Mr. Scanlon's professional representation, commencing with initiation of the attorney-client relationship and continuing through the conclusion of such representation, including any related third-party litigation involving subrogation rights."

As a part of this investigation a number of defendant's clients were called and testified to the manner the attorney-client relationship was initiated. After this testimony, the grand jury requested the attorney general to file a complaint with the Commission on Practice charging defendant did solicit without legal cause or permission, the individuals who testified.

Defendant was called to testify before the grand jury and refused to answer questions posed to him asserting his right against self-incrimination. Thereafter, in an effort to find where defendant received the information, defendant was granted immunity against prosecution except prosecution for contempt and perjury. He testified for two days before the grand jury, denying he solicited these persons and offered explanation for the manner in which they became his clients. Following defendant's testimony there was further inquiry and some clients were recalled. Some people, whom defendant said referred these clients to him, were

- 2 -

called to testify. The grand jury returned an indictment charging eighteen counts of perjury.

Defendant filed a motion to dismiss these charges, which was granted. The state appeals.

We summarize the issues presented to be:

1. Whether the evidentiary standard required for proof of perjury was met?

2. Whether the allegedly perjured testimony was material?

3. Whether off-the-record statements made to the grand jury were grounds for dismissal?

4. Whether there was sufficient prosecutorial misconduct to warrant dismissal of the indictment?

5. Whether the admonition of secrecy delivered to the grand jury witnesses was grounds for dismissal?

First, we consider the strict evidentiary standard required for the proof of perjury. Three Montana statutes are applicable:

Section 94-7-202(7), R.C.M. 1947, provides:

"No person shall be convicted of an offense under this section where proof of falsity rests solely upon the testimony of a single person other than the defendant."

Section 93-401-1, R.C.M. 1947, provides:

"The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason."

Section 93-1401-2, R.C.M. 1947, provides:

"Perjury and treason must be proved by testimony of more than one witness; treason by the testimony of two witnesses to the same overt act; and perjury by the testimony of two witnesses, or one witness and corroborating circumstances." (Emphasis added.)

The basis for unusually stringent evidence requirements is set out in an article in 19 UCLA Law Review 638, 642,643 entitled

"Perjury and Related Offenses Under the Proposed California

Criminal Code." That same article points out at p. 645, that

Tentative Draft No. 6 of the Model Penal Code on this point reads:

> "Corroboration. Proof of guilt beyond a reasonable
> doubt shall suffice for conviction under this section
> as in other criminal cases, without special requirement
> of two witnesses or corroborating circumstances.
>
> "[Alternate,rejected by the council: No person shall
> be convicted of an offense under this Section where
> proof of falsity rests solely upon contradiction by
> testimony of a person other than the defendant.]"

The official draft of the Model Penal Code, which served as the

basis for section 94-7-202(7), R.C.M. 1947, used the alternate

provision. In Montana Criminal Code, 1973, Annotated, Prof.

William F. Crowley - Editor, at page 293 the annotator points out:

> "The common law rule that falsehood be established
> by two witnesses is adopted in part by subsection (7).
> At the common law this rule was adopted to deal with
> the problem of an oath against an oath. The modern
> rationale is a policy determination based on a balancing
> of the need for protection of witness and the need to
> maintain the sanctions for false testimony. In adopting
> the requirement of more than one witness Montana has
> followed the majority of states in affording additional
> protection to the witness at the possible cost of being
> unable to convict an apparent perjurer. * * *"

As noted above, the standard of proof required in Montana under

the new code section 94-7-202(7), R.C.M. 1947, requires that the

proof of the falsity of a statement must be more than the contra-

diction testimony of a person other than the defendant. The legis-

lature recently made this policy determination and despite the

contrary rule urged by the state, this is the rule in Montana.

The exact requirements of this evidentiary rule in perjury

cases are apparent from an examination of the California cases inter-

preting the section of the California Civil Code, identical to

Montana's section 93-1401-2, R.C.M. 1947.  In an article entitled

"Proof of Perjury: The Two Witness Requirement", 35 Southern

California Law Review 86,97, it is stated:

> "In summary, the California attitude is, and remains,
> that direct testimony of at least one witness must
> always be introduced to prove the falsity of the
> statement set forth in the indictment; circumstantial
> evidence alone will not support a perjury conviction."

In People v. Roubus, 53 Cal.Rptr. 281, 417 P.2d 865, 866,

867, the California Supreme Court, sitting In Bank, outlined this

evidentiary requirement:

> "Perjury must be proved by the testimony of two witnesses,
> or of one witness and corroborating circumstances. * * *
> This statutory provision has been interpreted as pre-
> scribing not only the amount but also the kind of evidence
> necessary to support a perjury conviction. * * * Direct,
> as distinguished from circumstantial, evidence of the
> falsity of the defendant's testimony by at least one witness
> is generally required. * * * This does not mean that there
> must be a denial in the very words of the defendant's
> testimony * * * but that there must be testimony by at
> least one witness furnishing direct evidence of facts
> contrary to, or absolutely incompatible or physically in-
> consistent with, that sworn to by the accused * * *.
> Evidence that establishes facts from which the falsity
> of an alleged perjured statement may or may not be inferred
> is insufficient under the direct evidence rule. * * *
>
> "The rule requiring proof of falsity by direct evidence has
> been criticized. * * * However, this requirement was early
> established in this state by decisions construing our
> statutory provision.  It is noteworthy that a majority of
> jurisdictions which apply the rule that falsity must be
> proved by the testimony of two witnesses, or of one witness
> and corroborating circumstances, hold that circumstantial
> evidence alone is generally insufficient to establish
> falsity."

An early Montana case indicates this is the law in Montana

as well.  In State v. Gibbs, 10 Mont. 213, 219, 25 P. 289, it is

said:

> "'It is not necessary that there should be two living
> witnesses in contradiction of the statement of the de-
> fendant to justify a confiction of perjury.  It is suffi-
> cient if, in addition to one directly opposing witness,
> corroborating circumstances sufficient to turn the scale
> and overcome the oath of the defendant and the legal
> presumption of his innocence are proved.'"

The Court in Gibbs approved this instruction as to proof of perjury:

> "'* * * that such act of perjury has been established
> to your satisfaction beyond a reasonable doubt by more
> than one witness, or that the testimony of such witness
> has been corroborated upon that point by other facts and
> circumstances proved on the trial. In other words, the
> direct evidence of one witness alone is not sufficient
> to convict of the crime of perjury, unless corroborated
> by other facts and circumstances proved on the trial.'"

In Gibbs the Court was construing the then equivalent code section

to section 93-401-1, R.C.M. 1947. Section 93-1401-2 had not been

enacted at that time. In State v. Jackson, 88 Mont. 420, 293 P.

309, the Court cited Gibbs as authority of the requirement that

perjury must be proved by the testimony of two witnesses, or one

witness and corroborating circumstances indicating that this was

the law even prior to the passage of section 93-1401-2, R.C.M. 1947.

A subsidiary question to be determined regards the nature

of the corroborating circumstances that must be proved. The rule

in California, that the state argues we should adopt, is stated

in People v. Casanova, 54 Cal.App. 439, 202 P. 45,47:

> "* * *The statute respecting the quantum of evidence
> necessary in perjury cases will be satisfied, if there
> be the testimony of one witness to facts that are
> absolutely incompatible with the innocence of the
> accused, corroborated by circumstances which, of them-
> selves and independently of such directly inculpatory
> evidence, tend, with a reasonable degree of certitude,
> to show that the accused is guilty as charged."

See also: People v. Pustau, 39 C.A.2d 407, 103 P.2d 224,228.

In Gibbs the Court said that "corroborating circumstances

sufficient to turn the scale and overcome the oath of the defendant

and the legal presumption of his innocence" are all that is required.

In People v. Todd, 9 C.A.2d 237, 49 P.2d 611, 614, it is pointed

out:

"It is also well settled that motive and design to commit a crime, if proved, may be considered a quilty circumstance * * * and consequently may serve legally as corroborative evidence; and in this behalf it has been repeatedly held that where, as here, it is claimed that several offenses have been committed as part of one scheme or plan, all of the same general character, tending to the same common end, evidence thereof may be received to show the process or motive and design to commit the particular offense with which the accused is charged, and as tending to show logically that the particular offense for which he is being tried was part of such common scheme."

The second issue involves the requirement that the alleged perjured statement be material. The Montana statute, section 94-7-202(3), R.C.M. 1947, provides:

"Falsification is material, regardless of the admissibility of the statement under rules of evidence, if it could have affected the course or outcome of the proceeding. It is no defense that the declarant mistakenly believed the falsification to--be immaterial. Whether a falsification is material in a given factual situation is a question of law."

The Commission Comment points out:

"The proposed definition of 'materiality' in subsection (3) does not differ substantially from that given by prior law."

In State v. Hall, 88 Mont. 297, 304, 292 P. 734, the Court said:

"* * *Also it may be conceded that the general rule is that anything so connected with the matter at issue as to have a legitimate tendency to prove or disprove some material issue by giving weight or probability to, or detracting from, the testimony of a witness, is material * * * and that, if evidence is circumstantially material, it is sufficient to sustain a perjury charge."

The test for materiality as set out by the statute is not particularly difficult to meet, it requires only that in the actual factual situation involved would it be reasonable to find that the defendant's statement, if believed, could have altered the course of the investigation.

While it is true that a false answer to a trivial or irrelevant question does not in and of itself hamper the functioning

- 7 -

of the state, the court, whose integrity depends on the truth,
has a special interest in seeing those who do not tell the truth,
whether to a relevant or irrelevant matter, do not go unpunished.
See section 94-7-203, R.C.M. 1947, which provides for the punish-
ment of a false statement in an official proceeding whether that
statement was material or not, and makes such false statement a
misdemeanor.

We note here that nearly all cases cited by both parties
involve a post-trial, not post-indictment determination of these
required elements. We are considering here perjury counts before
a grand jury and not after a trial. The grand jury statute, section
95-1409(c), R.C.M. 1947, provides:

> "The grand jury shall find an indictment when all
> the evidence before it, taken together, if unexplained
> or uncontradicted, would, in its judgment, warrant a
> conviction by a trial jury."

The district court dismissed each of the eighteen counts
based on the absence of one of these elements---lack of direct
evidence as to the falsity of the statement, lack of corroboration
or lack of materiality. Several of the counts against defendant
arose out of transactions wherein defendant testified the clients
were referred to him by an uncle and aunt, Mr. and Mrs. Richard
Mullins or by a Mr. and Mrs. Herman Meyers, long time family friends.
At the time defendant testified all of these people were deceased.
The clients who appeared before the grand jury denied ever knowing
ank of the named people, however, these deaths prevented the state
from getting the necessary direct evidence required to prove perjury.
The district court dismissed these counts for lack of direct evidence
as to the falsity and these dismissals were proper.

We have carefully reviewed all other counts, and hold that
with the exception of counts 9 and 10, they should have been dismissed.

The dismissal of those counts comes from the fact they were not supported by direct evidence of the falsity of the defendant's statements or due to the lack of sufficient proof to offset defendant's failure to remember certain facts.

A summary of count 9 charges that Jack M. Scanlon, falsely testified that Grace A. Rieker first contacted him on the telephone, when in truth and fact he knew that he had instigated the telephone conversation with claimant for the purpose of initiating a client-attorney relationship; and that he so testified to deceive and frustrate the grand jury in its investigation contrary to section 94-7-202, R.C.M. 1947.

A summary of count 10 charges that defendant falsely testified that prior to the telephone call from claimant he had never heard of the claimant nor the fact that she was injured, while in truth and fact he knew the claimant and that she had been injured prior to ever talking to her, and he so testified for the purpose of deceiving and frustrating the grand jury contrary to section 94-7-202, R.C.M. 1947.

When asked how he came to represent Mrs. Grace Rieker and her claims before the Industrial Accident Board, defendant in answer to questions testified:

> "Q. How did she come to know you? A. I don't know you will have to ask her that.
>
> "Q. The first contact with Grace Rieker was by her telephoning you? A. As I recall, yes.
>
> "Q. Let me give you your files, in case you need them to refresh your memory. Did she call you in your office in Helena? A. As I recall, yes.
>
> "Q. What did she say to you? A. She asked me about, as I recall, representing her in her industrial accident claim.

"Q. Now which claim was this? A. As I recall, there were two claims. One was for a neck injury, and she called me relative to that?

" * * *

"Q. All right. In response to her phone call, what did you do? A. I met with her.

"Q. Where? A. In Boulder.

"* * *

"Q. And who was present? A. I think her husband was, but I am not sure.

" * * *

"Q. Now, this was the very first contact that you ever had with her, was when she phoned you? A. As best I can recall, yes.

"Q. And prior to her phoning you, you had never heard of Grace Rieker or her injury or anything else? A. No.

"* * *

"Q. But, you are confident that you did not solicit the attorney-client relationship yourself? A. Yes, I am confident I didn't solicit the attorney-client relationship myself."

Mr. Fuller testified as to his recollection of the Rieker case indicating he and defendant were high school friends and they had kept that relationship going over the years. He said that after he had talked with investigators of the Workmen's Compensation investigation team, and just before he testified before the grand jury, he called Scanlon about the Rieker case because it was one they had asked questions about. He testified:

"Q. Well, did you check with him to make sure that his recollection of the Grace Rieker incident was the same as yours? Just to make sure that in your own mind that your memory--- A. Yes I did.

"Q. So you went through with him how he developed his relationship with Grace Rieker in so far as you were concerned? A. The only thing I asked him was related to if he recalled that there were two calls made by me, if I ever told him that, or if he had made a phone call from my home.

- 10 -

"Q. What did he say? A. He said no.

" * * *

"Q. In other words, according to what Scanlon told you on the phone on March 26th, Grace Rieker made the first contact with Scanlon? A. Yes.

"Q. And it was either that she phoned him, asking for assistance of an attorney --- right? A. Right.

"Q. -- or that she came to his office? A. Right.

"Q. But did he tell you that in no way that he contacted Grace Rieker, telephoned her, or through, talked to her? A. Right."

Fuller also testified he did not remember either giving the Riekers the phone number of Scanlon; or giving Scanlon the Riekers' number.

Mrs. Rieker testified before the grand jury that she was a secretary-receptionist at the Boulder River School and on December 22, 1967, she had slipped down the school steps and received an injury that incapacitated her for a period of time. For that period she received no compensation other than from her sick leave. She returned to work and several years later on June 18, 1970, she was injured and from this injury she received compensation on an off and on basis. She testified that during her recovery a Mr. Ron Fuller of Boulder asked her if she was interested in a lawyer to help her get her industrial accidents payments. He told her he had a friend that was a lawyer and would she like him to come to talk to her.

Her testimony on the Fuller calls was:

"Q. As a result of this difficulty, did someone make a contact with you? Did some attorney make a contact with you, either personally or through someone else? A. Yes.

"Q. And what was the name of that attorney? A. Mr. Jack Scanlon.

- 11 -

"Q.  Prior to this contact being made to you, had you ever personally known Scanlon?  A.  No.

" * * *

"Q.  How did this initial contact regarding Scanlon take place.  A.  A gentleman by the name of Ron Fuller---

" * * *

"Q.  So Fuller volunteered over the phone that he had a friend who was a lawyer and might be able to help you? A. Yes.

"* * *

"Q.  Now did you have additional problems with the Industrial Accident Board?   A. Yes.

"Q.  Did you, as a result of those additional problems say, hey, I remember that fellow Scanlon and go and call Scanlon?  A.  No.

"Q.  Were you contacted a second time?  A.  Yes.

"Q.  And who did this?  A.  Mr. Fuller again.

"Q.  All right.  And was this without a request on your part?  A.  Yes.

" * * *

"Q.  Was there anybody else there with Fuller at that time?  A.  Yes.

"Q.  Who was that?  A.  Mr. Scanlon.

"Q.  And how do you know that?  A.  Because Mr. Fuller asked me if I would like to talk to him on the phone and I said, well, I supposed I could talk with him about my problem, so I did talk to him on the phone.

" * * *

"Q.  Iday, so what did Scanlon say when he got on the phone? A.  Told me he would like to handle my case, he had heard about it, was interested in it and thought he could help me.

"* * *

"Q.  Did he eventually come over to your your house?  A.  Yes.

"* * *

"Q.  And when he talked with you, did he seem to know the details of your current accident?  A.  Yes.

- 12 -

"Q. How did he learn about the 1967 accident? A. He asked me at that point if I had ever had a previous injury, and I said yes."

Al Rieker, husband of Grace, testified corroborating her testimony that after her 1971 injury she was contacted by Ron Fuller about whether she needed a lawyer and they told him "no". About the second contact by Fuller he testified:

"Q. * * * Now, at a later time do you recall being home when the telephone rang? A. Yes.

"Q. Did you answer or did your wife? A. My wife answered it.

"Q. * * * Now, after she finished talking on the phone did she tell you who had called? A. Yes, she did.

"Q. And who did she say? A. She said Ron had called and he had put Jack Scanlon on and she talked to Jack Scanlon.

"Q. While you were in the house? A. Yes.

"* * *

"Q. All right. Did Scanlon eventually come over to your home? A. Yes, he did.

"Q. Now, when Scanlon came to your home, did he tell you what the reason was that he talked to your wife over the phone? A. Yes, he did. He said he had been in contact with Ron Fuller and they had talked over our case and thought we needed a lawyer, or that he might help.

"Q. That he, Scanlon might help? A. Yes.

"Q. Okay. So that Scanlon told you he had found out about your wife's claim before talking to your wife, from Fuller himself. A. Right.

"Q. And that was the reason that he had talked to your wife on the phone? A. That is correct.

"Q. And then later on, at a later time, he came to your house and he confirmed that to you. A. Yes."

As to these counts there are clearly contradictory statements to defendant's testimony that prior to actually speaking to Grace Rieker, he was both unaware of the claimant or her injuries. The necessary corroboration is provided by the testimony of Al Rieker, whose testimony was that defendant came to the Rieker home and

- 13 -

told them that before talking to Grace Rieker he had been in contact with Ron Fuller and had talked over the Grace Rieker injuries. Such testimony is adequate to corroborate that he knew of her injury from Fuller, prior to coming to the Rieker home.

The remaining three issues do not go to the actual merits of the charges individually but they alleged general procedural and prosecutorial improprieties as the basis for the dismissal of all charges against defendant. These attacks must be viewed against the function of the grand jury. In United States v. Calandra, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L ed 2d 561, 569, the United States Supreme Court pointed out:

> "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person."

These alleged improper procedures do not reach the merits of the individual charges but rather attack the matter in which the otherwise valid criminal charges are determined and instituted and are a weak basis for asking for dismissal of the charges.

The first of these is the request that the criminal charges be dismissed for off-the-record statements made by the special assistant attorneys general prior to the returning of the indictment. There was no record of what was said because the statute, section 95-1406(e)(1), R.C.M. 1947, requires only that the testimony of witnesses be recorded. This session, characterized by the district court as a "prep session", could not have resulted in the grand jury returning improper or unsupported indictments. The state urged the district court to limit its examination to

the probable cause and the evidentiary support for each count. The district court said it "would prefer to do so and leave the matter up to the committee on practice but we can not overlook the devastating effect of the grand jury indictment of the person charged."

While this Court does not overlook the effect of the indictment, it cannot uphold the dismissal of otherwise valid criminal counts because of possible improper statements made to the grand jury prior to the indictment. The merits of invalid counts may be challanged individually and the defendant's rights thus protected.

The same may be said of the allegation that there was sufficient prosecutorial misconduct to warrant dismissal of the indictment. Nothing in the record here approaches this level.

The admonition of secrecy that was given to witnesses before the grand jury was not proper because it did not follow the procedure outlined in section 95-1409, R.C.M. 1947. However, the requirement was lifted after indictment so that defendant's ability to prepare his defense has not been impaired. The district court did not expressly base dismissal of the charges on this error, it said:

> "While this apparent utter disregard for the orders
> of this court and the requirements of the law may not
> have demonstrably prejudiced the defendant, it is
> nevertheless suspect as an unauthorized intimidation
> of witnesses by the State, which could, if left standing
> or further ignored redound to the prejudice of the
> defendant. This should not be condoned or disregarded
> in considering whether the indictment should be dismissed."

Under the circumstances disclosed here; the error is not that fatal.

The two remaining valid charges are remanded to the district court for trial on the merits.

Justice

- 15 -

We Concur:

_____
Chief Justice

_____

_____
Justices.

_____
Hon. L. C. Gulbrandson, District
Judge, sitting in place of Mr.
Justice Wesley Castles.

- 16 -

Mr. Justice Gene B. Daly dissenting:

I dissent:

There will be a change in the makeup of this Court on January 3, 1977.  Therefore the Court as presently constituted must complete its work assignments no later than  Thursday, December 30, 1976 at 5:00 p.m.

The majority opinion in this case was delivered to my chambers for study and comment Wednesday, December 29, 1976. I was not, previous to receipt of this opinion, accorded an opportunity to join with the Court in conference regarding their views or to express mine.  I have been present at Court at all times during which the majority view could have been reached and reduced to writing.

Obviously the time required to research and properly prepare a responsible legal dissent to the majority's position is no longer available.

Therefore, I would advise that I have strong views  that differ from the majority position and wish to reserve the right to prepare and file them at a later date.

_____
Justice.